Estate of William W. Parish, Deceased, Varnum A. Parish, as Administrator de bonis non v. Commissioner.
Estate of William W. Parish, Deceased v. Commissioner
Docket No. 12295.
United States Tax Court
1949 Tax Ct. Memo LEXIS 241; 8 T.C.M. (CCH) 257; T.C.M. (RIA) 49056; March 15, 1949
Allin H. Pierce, Esq., 135 So. La Salle St., Chicago, Ill., for the petitioner. William Schwerdtfeger, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This cause involves estate tax. Deficiency was determined in the amount of $15,635.33. Since the parties have stipulated that certain administration expenses shall be stipulated or determined upon hearing under Rule 50, the only question left for our consideration is whether certain transfers were made by the decedent in contemplation of death within the meaning of section 811(c) of the Internal Revenue Code. Varnum A. Parish, William J. Parish, and Anthony Parish were designated in the notice of deficiency as statutory executors *242 and trustees of the estate of William W. Parish, and the petition was filed by Varnum A. Parish as administrator de bonis non and by Varnum A. Parish, William J. Parish, and Anthony Parish, as so designated. The respondent's motion to strike from the caption the "Estate of William W. Parish, Deceased, Varnum A. Parish as administrator de bonis non" was denied on January 31, 1947. At the trial William J. Parish and Anthony Parish moved for a judgment of no law as to them in their individual capacities. The respondent on brief states that he has no objection to such a finding of law as to William J. Parish and Anthony Parish as representatives of the estate, provided it is found that Varnum Parish is the only duly qualified and acting administrator. We find that Varnum Parish is the only duly qualified and acting administrator of the estate of William W. Parish, deceased, therefore judgment of no liability is found as to William J. Parish and Anthony Parish as individuals. Any liability on their part as transferees is not before us in this cause. Findings of Fact The petitioner herein is the estate of William W. Parish, deceased, and Varnum A. Parish is administrator de bonis non *243 of the estate of decedent and the only administrator of such estate. The estate tax return was filed with the collector of internal revenue for the first district of Illinois. Estate tax was paid as follows: On January 9, 1946, $8,473.37; on May 6, 1947, $15,500; and on July 1, 1947, $137.55. The decedent William W. Parish was born August 25, 1855. He was born in Momence, Illinois; lived at that town practically all his life; died there at the age of 89 years on October 15, 1944. He died intereste, survived by a widow, Elizabeth Heck Parish, and four children, Varnum A. Parish, Carrie M. Parish, William J. Parish, and Anthony Parish, all residents of Monence, Illinois. The four children were children of a first marriage. His principal life work was farming, raising cattle, hogs, and other live stock. In addition he was the founder and president of a bank at Momence, Illinois. Varnum A. Parish and William J. Parish were lawyers in Momence, aged, respectively, 63 and about 58 years, at the time of trial. Anthony J. Parish, aged 55 years at the same date, was cashier of the Parish Bank. He lived with his father, the decedent, until the death of his mother, Catherine Parish, in January *244 1940 and thereafter until his father's remarriage in the latter part of December 1941. William J. Parish lived with his father practically all of his life until about 1938 when he married. Carrie Parish is unmarried, and about 60 years of age at time of trial. The family relationship was very close and harmonious. Decedent's second wife, Elizabeth Heck, was 65 or 70 years old at the time of her marriage to the decedent. In 1920 decedent founded the Parish State Bank, a private bank in Momence, Illinois. It was later in 1920 organized as a state bank. At that time decedent gave each of his children ten shares of stock in the bank. Likewise he gave each of the sons ten shares in 1932, ten shares in 1933, 40 shares to William J. being 14 shares in 1935 and 26 shares in 1939, and 40 shares to each of the others in 1939. By the end of 1939 each son owned about 60 shares, 198 shares were retained by decedent, and the balance of the 500 shares issued were owned by outside interests. The decedent's father died at the age of 93 years. Ten or 15 years before the father died he divided his property between his two children, decedent and decedent's sister. Decedent often remarked that he intended *245 to do the same as his father had done. In 1923 decedent deeded to each of his children 70 acres of land out of four separate farms, stating that it was his intention to give the balance of the farms to them at an early date. In 1931 the Parish State Bank, and the First National Bank of Momence, the only other bank in town, had to close their doors. Petitioner announced and published that he would use his entire estate to pay the creditors of the bank. He was director and president of the Parish State Bank. He instructed his sons, Varnum and Anthony, to call a depositors' meeting, at which he advised the depositors of his intention of paying all creditors who were depositors. Varnum and Anthony took the matter up with the state auditor of Illinois and his chief bank examiner. Word was sent to William J. Parish, who was in California, to come and help on the matter. The plan was to pay 60 per cent to the depositors immediately on opening the bank with 40 per cent to be waived and assets to be taken out to pay the 40 per cent, the matter to be under their supervision, payment to be made when possible. The decedent had about 2,000 acres of unencumbered land besides other holdings. The *246 decedent's net worth at the time the bank closed was about $150,000, taking into consideration depressed conditions and salability. He mortgaged lands, including the 70 acres which he had conveyed to William J. Parish and which was deeded back to him, and borrowed money. The bank was reopened on November 19, 1932, as Parish Bank and Trust Company and the creditors were immediately paid 60 per cent. The First National Bank never reopened. The other three children each turned the rent from the 70 acres of land over to the decedent towards the liquidation of the 40 per cent owed to the depositors. That liquidation went on for approximately ten years. Anthony and William J. worked together on the liquidation, Anthony for about a year, William J. about half that time, both drawing $50 a month. Varnum was not active in the bank. The three brothers spent considerable time for several years after that trying to liquidate the frozen assets. Between 1932 and 1940 Anthony donated approximately $1,500 a year of his salary towards the payment of the 40 per cent to its stockholders. He took out worthless securities in that amount. The decedent put in more than his salary from the bank. William J. *247 and Varnum helped on the legal details of the liquidation. Anthony devoted all of his time to the bank. The decedent kept urging the sons to complete the liquidation. He turned his entire dividends received from the bank, or payments received by him on depositors' rights which he had purchased, back into the liquidation. The creditors were finally paid 100 per cent. A dividend was paid in December 1940, and early in 1941 there was practically enough money to pay the remainder on the deposits. The payment to the depositors of the Parish State Bank was through a trust account in Parish Bank and Trust Company. The decedent and his sons were only morally liable to the depositors. The final payment was made to the depositors about December 1941. They were pretty well paid out in 1939 but not completely until the latter part of 1941. The money was practically all in at the beginning of 1941 but some depositors could not be found and the matter was not closed until the end of 1941. The bank liquidation was substantially complete when the decedent gave each son shares of stock in 1939. The major part of the payments was completed prior to January 14, 1939, and the decedent was, so far as *248 liquidation of the frozen deposits was concerned, in substantially as good a position on January 14, 1939, as he was in December 1941 so far as making gifts to the children. The 40 per cent owing to the depositors of the Parish State Bank, after the bank reopened, amounted to about $40,000 to $50,000. In 1940 about 10 per cent of the 40 per cent remained unpaid and that was paid off in 1941. The next to the last payment was made in 1939 and was 10 or 15 per cent. While the liquidation was going on and the decedent was urging his sons to hurry the liquidation he told them he would like to dispose of his property so that he would have an opportunity to enjoy the rest of his life while he was having good health and so that he could travel. He said that getting the depositors paid was the first thing and still he would like to see the estate conserved for his children and he thought the quicker the 40 per cent was paid the quicker he was going to divide his property. He said he wished to be able to take life easy and to travel and wanted to turn it all over to his children, retaining enough for himself to be assured of a livelihood from then on out. In 1940 he deeded to each of the *249 children the farm out of which he had given 70 acres to such child in 1923. The deed to Carrie was in trust, her brothers being trustees. He filed a gift tax return showing total value as $33,500. The gifts of bank stock by the decedent did not prevent or delay the payment to creditors or depositors and the decedent made no gifts other than bank stock until the depositors had been paid or he was practically sure that they would be paid. He was practically sure when he made the gifts in 1940. Shortly thereafter he began to speak of making further gifts to the children and remarked that Varnum was delaying the matter. About June 1941 the decedent began to be interested in Elizabeth Heck. He said little about this matter to his children. Decedent told Anthony nothing about it but William did. Decedent's impending marriage was a shock to Anthony. It was of concern to the brothers as to what would become of the bulk of the property. Prior to decedent's marriage Anthony discussed with his brother the disposition of the property. Anthony thought his father had changed his plans about marriage. Anthony did not discuss with his brothers at any length the possibility that his father might *250 remarry in 1941. In the summer of 1941 decedent said: "I might take a notion to get married and if I did it wouldn't be so convenient to transfer the real estate as it is now." Decedent had told W. J. Parish, who shortly before that time had told Varnum, that his father was going to get married and whom he was to marry. Varnum did not like the idea of his father getting married but felt that it would do no good for him to try to persuade his father one way or the other. The proposed wife did not live in Momence and Varnum did not know that his father went with her except what his brothers told him. He also told Varnum that he thought he ought to make the gifts because if he did not make them his second wife might spend part of the property or a substantial part of the property that he and his first wife had made. He never definitely stated to Varnum that he was going to get married but only that he might take a notion to get married. He also said: "If I do get married it won't be so convenient to complete the deeds and have them executed as it is now." Varnum was concerned to a certain extent about his father's proposed second marriage. He was concerned about what disposition would *251 be made of his father's property in the event of second marriage but he was not disturbed. When the conveyances were made in October Varnum felt that his father had given up the idea of getting married. In the conversations with Varnum the decedent indicated that after marriage he was going to live on the same basis as before except that he wanted to travel a little more than he had before. He stated that he did not want his second wife to spend a substantial part of the money that his first wife had helped him accumulate. Decedent married Elizabeth Heck about December 29, 1941. Immediately after his marriage the decedent went to Florida on his honeymoon. He was there until the latter part of March 1942 and thereafter he stayed in Chicago until about the middle of May 1942 living in a hotel apartment. He and his wife then came to Momence and stayed in the farm house until about November 1, 1942. During the summer decedent bought and repaired a house for about $5,000; also bought furnishings. About November 1, 1942, he and his wife moved into the house. William J. Parish made an affidavit with reference to the decedent's estate. In such affidavit he stated as follows: "Several *252 days previous to when the decedent completed the purchase of the new home referred to, this affiant suggested to the decedent that he place the title to his home in this affiant, reserving to his wife a life interest therein." The house was held in the name of decedent and his wife as joint tenants and was included as a part of his property in the estate tax return. The furnishings which the decedent placed in the house he bought after his second marriage were valued in the estate tax return at about $600. They were not extravagant and $600 is approximately correct. Decedent's scale of living during the last five years of his life was comparatively modest. His household expenditures were not large. His wife did not have a great deal of property. She owned a small farm which was mortgaged. Decedent paid off the mortgage. On October 20, 1941, the decedent executed a trust instrument conveying real estate and personal property of a value of about $115,000 including 188 shares of stock in the bank to his three sons as "Trustees of the W. W. Parish Estate." The instrument recites, in pertinent part, that this was done "for the purpose of relieving the party of the First Part [decedent] *253 from the burden of managing and looking after said property and for the purpose of providing an adequate income for the party of the first part during his lifetime." The instrument provided further that the trustee should pay to the decedent such income as he should demand and that in case the net earnings of the trust estate should not equal $10,000 during any year, he could demand and receive an amount out of trust corpus which added to the net income would equal $10,000. The instrument further provided that upon the death of W. W. Parish the trustees should sell the property and divide the proceeds among his children, except that one-fourth should be invested in the purchase of an annuity payable to Carrie Parish. Provision was made for change in the trust by agreement between decedent and the trustees. The property placed in the trust was reported in gross estate on the estate tax return. Likewise on October 20, 1941, the petitioner conveyed outright to each of his four children an undivided one-fourth interest in certain real estate and other property. The deeds and the trust instrument were acknowledged by the decedent on October 22nd. Varnum drew both the deeds to the property *254 and the trust instrument and had them both prepared for decedent's signature at the same meeting. Gift tax returns were filed by decedent; also by Anthony J. Parish, V. J. Parish, and W. J. Parish giving the date of the gift as December 1, 1941. The transfer of the property outright and the following gifts of money were all considered by them as one gift. The property conveyed on October 20 consisted of several parcels of real property and some real estate contracts which were almost paid out; also a chattel mortgage. Two real estate contracts involved small amounts and one involving about $4,800 was on a piece of property about 20 miles from Momence. One of the parcels of real estate was a half interest in 240 acres, involving considerable bookkeeping. Another 40 acres lay away from any other farm. Another item of 125 acres was about 20 miles away from Momence, another item an apartment house in Kankakee, Illinois, another a store building in Momence, which was in need of repair. Another item was 198 acres of land in Indiana about 200 miles away, and another was an interest in 320 acres of wheat land in the state of Washington. The property in Indiana, the apartment building in Kankakee, *255 and the half interest in the 240 acres of land were acquired from the closed bank in connection with the liquidation program. Also $28,000 in cash was given to the children, $7,000 to each, being $4,000 on November 15, 1941, and $3,000 on December 2, 1941, - as to the three sons - and a $7,000 check being given to Varnum Parish in the latter part of December 1941 for the purchase of an annuity for Carrie. The total value of the property deeded and the cash is shown in the deficiency notice as $64,130.03. It was returned as $60,680 in the gift tax returns. There is no dispute as to values. After making the gifts on October 20, 1941, the decedent had $3,192 in bank at Momence and $3,000 in bank in Chicago; also live stock on hand which he disposed of for about $15,000, and ten shares of bank stock, totaling altogether $19,310.95. The $15,000 was the sale price of the cattle which was sold from about four months to about ten months thereafter. Decedent also had the grain which was fed to the cattle. He bought the cattle in November 1941. In December 1941 decedent deposited $12,000 at one time in the Parish Bank and Trust Company. That was prior to the check he gave for $7,000 with *256 which to buy insurance for Carrie. On November 1, 1941, he deposited $4,009.90 and on November 15 deposited $16,000. The following deposits were also made, $1,700, $1,600, and $1,500. In addition to the farms previously given, Anthony J. Parish at that time had a modest income for his services as cashier of the bank, and a house and lot; William J. had only what he could earn; Carrie had only $4,000 or $5,000; and Varnum had a net worth of about $50,000. The petitioner wanted to give his children "all of his property excepting what he thought he would need for his own living up to the time or that would last him as long as he lived." Anthony did not report as income any of the property that he received in 1940 or 1941, because he considered it as a gift. The same is true of the stock he received in 1939 and in 1933. Varnum Parish did not return as income the $7,000 because he considered it a gift. He considered that he had given his father the rents to that extent and that his father gave it back to him. His father had never agreed to give it back and he had never asked his father for it. There was no legal obligation to repay it. The gift of the farm to the sons in trust for Carrie *257 in 1940 was not reported on gift tax returns. Varnum considered the gifts in 1940 and 1941 partly in compensation for services in connection with the work done for the bank. He did not report it as income. He regarded it as a gift. His father had told him "whatever you save, help me to save in this estate. It will eventually be yours anyway." When his father gave him 70 acres of land about 1923 he said that he intended also to give the farm that went with that 70 acres and commented on the fact that his father had given his property away a number of years before he died and reserved only enough to keep him and that he thought that was the proper way to do. When the decedent made the gifts in the fall of 1940 he stated that he intended to give them some more property a little later on. Early in 1941 on several occasions the decedent stated that he would like for the boys to get together with him to figure out how much property he should keep and that he would like to transfer the rest to the children; that he wanted to keep enough for his own livelihood as long as he lived. Varnum was in no hurry and his father spoke about the matter several times. It was not until the summer of 1941 *258 that he indicated urgency. When the decedent asked Varnum to hurry up and draw the conveyances he said that he wanted to keep enough of the property to live on and that he would like to fix the property so that the boys could take care of it for him and have him get the income so he would not be bothered with the burden of managing it. That statement was between the summer and the middle of October of 1941. The decedent said repeatedly that he wanted to repay the sons for the help they had given him in getting the bank back to a solid basis and wanted them to have the use of the property before they were old people, wanted them to be able to enjoy the gifts. He often said he did not want to wait and give it to them when he died. In 1941 he mentioned to Varnum that he felt that in view of Varnum's large family he needed help to educate them. Varnum had two girls in college and two boys had been through college, and he had three more to go. When the property was deeded in October decedent indicated that he intended to give the children some cash later on. On several occasions he said he wanted to be relieved of the management of most of his property. The decedent was a tall lean man, *259 weighting about 168 pounds, with iron gray hair. He was alert and very active, and neat in his appearance; he wore glasses only to read; he took trips by airplane, motor car, and train all across the country. In 1941 he made a trip to New York partly by train and partly by automobile. A little later he took a trip to Boys Town, Nebraska; also to Fort Dodge, Iowa, by plane. He habitually arose early; and drove his car every day. About November 1941 he had his son drive him to the airport at Chicago arising at three o'clock in the morning, took a plane to Kansas City, arriving there about 7:30 a.m., and went to the Union Stock Yards where he spent the day riding and selecting cattle. He returned home that evening. He took a train to California in 1940 or 1941, and for a number of years had spent some winters in Florida. He had a slight limp resulting from a leg broken when he was a young man but it did not greatly affect his walking. About 1937, when his first wife was in the hospital at Mayo's for about ten days, he took a room at the hospital. He had contracted a severe cold, and was confined for a week or ten days. About August 1941 he went to Mayo's hospital. He had some eruptions *260 on a hand and ear and one side of his face. He stayed at a hotel but was treated in the hospital about three weeks and his physical situation cleared up. His attitude toward life was cheerful. Five or six weeks before he died he fell while getting into his car and though assisted to his feet he drove home. He never left the house after that day. Just before his death decedent developed some complications, some kidney conditions and a little swelling; also a heart failure condition such as elderly people have when they are put to bed. He was very alert mentally until the last day and he never indicated to the physician who treated him that he was anticipating death or planning for it. He remarked to his physician that he was going to get up and work and buy cattle again. In physical condition he was young for his years. After making the gifts in 1941 the decedent continued as president and director of the bank during 1942 and 1943. He attended the meetings and had a desk at the bank but was not active in its management. After the gifts he left the active management of the bank more to his sons. When he was in town he was in the bank almost every day. He continued to draw the same *261 salary as before the gifts. The cashier frequently conferred with the decedent, and his advice was asked when considered necessary. After making the gifts in 1941 decedent continued to manage, for not very long, and to wind up a farm occupied by a tenant named Reckhamer and to be connected with the management of another farm owned by him, together with a tenant named Markot. He also continued to manage and to purchase live stock for the farm belonging to Carrie. He had cattle on each of these farms and continued to sell cattle for eight or ten months. He managed Carrie's farm until the year before he died. Revenue agent William C. Maguire investigated the estate. He had been an internal revenue agent for about 26 years at the time of trial. In the course of the investigation Anthony talked with him once at the bank in Momence. On another occasion, on July 16, 1945, Maguire, Anthony and Varnum had a talk in the office of Vernon Butz, an attorney in Kankakee, Illinois. Mr. Butz was present. There was discussion as to why the transfers were made by the decedent. Shortly thereafter Maguire wrote Varnum a letter asking him to put his reasons in writing. Maguire's letter is as follows: *262 "August 6, 1945. "In Re: Estate of WILLIAM W. PARISH, deceased. "Mr. Varnum A. Parish, "Momence, Ill.
"Dear Sir: "During my conference with you relative to the motivating cause whereby the decedent made certain gifts, I was advised that a part or all of these gifts were made by the decedent in order to get this property out of his estate before his second marriage. "As a matter of record please advise how much, if any of the property which is the subject of the gift tax returns for the years 1940 and 1941 were made for this reason. I would also like to know when the decedent first started going with his second wife and the date of the marriage to her. "The gift tax return for 1941 recites 'real and personal property' of an aggregate value of $60,680.00. Please give me a detailed statement of the items that make up this gift and the value of each on the date of death of the decedent. "Very truly yours, "S/Wm. C.Maguire "Wm. C. Maguire, "Internal Revenue Agent, "1100 Bankers Bldg." Varnum replied to Maguire's letter as follows: "August 7, 1945. "Mr. Wm. C. Maguire, "Internal Revenue Agent, "1100 Bankers Bldg., "Chicago, Illinois. "In re: Estate *263 of William W. Parish, Deceased. "Dear Sir: "Replying to your letter of August the 6th concerning the estate of William W. Parish, deceased, I wish to advise that we do not think that the gifts made in 1940 had any connection with his second marriage. Fifteen or twenty years ago our father gave each of us a 70 acre tract off from four respective farms, and he told us at the time that he intended later to give each of us a deed to the farm out of which our original 70 acres was conveyed. The gifts that he made to us in 1940 were transfers of the balance of these respective farms. He transferred to each of us at this time the remaining part of the farm out of which he originally conveyed us 70 acres apiece. We feel, therefore, that the 1940 gift was merely a completion of something that he had planned many years before. I might add here, that the reason he did not complete this gift before was due to the fact that the Parish Bank was closed during the depression and William W. Parish wanted this farm land so that he could use the income therefrom to pay off the depositors of the Parish Bank and Trust Company. It was not long after he had completed paying off the depositors in full *264 that he conveyed these farms to his four children. "The gifts made to us in 1941 were really made for two reasons. William W. Parish was contemplating marriage and he told us that he wanted to get his property in shape before he married; that he did not want his second wife to get a substantial share of his property that had been earned by him and his first wife. There was, however, a further reason for his gift in 1941. He stated that he did not want to be burdened with the responsibility of managing and looking after this property at his age. He did, however, even after he made the gift in 1941, retain the management of the farm which he had given our sister, Carrie M. Parish. He managed this farm up until the beginning of the year 1944, being the year in which he died. "You ask when the decedent first started keeping company with his second wife. We think that this began in June, 1941, to the best of our knowledge. He was married to her about the last day in December, and the exact date we do not know. "You refer to the gift tax return for the year 1941 and state that it recites real and personal property of an aggregate value of $60,680.00. This amount was the original amount *265 as set out in our return. However, there was finally a compromise settlement made with your office, and the figure was amended to $64,130.03. We are unable to give you a detailed statement of the items that made up this gift and the value of each on the date of the decedent's death, as requested in your letter. We do not happen to have a copy of the 1941 return for some reason or other. We do not have a copy of the 1940 return. There was a considerable correspondence with your office and adjustments made in connection with the last return and in some way or other in the shuffle we have lost our copy of the 1941 return. Doubtless you can get this information by examining the return itself. "If there is any further information that we can furnish you in this matter, we shall be glad to do so. "Very truly yours, "S/V. A. Parish "V. A. PARISH" VAP/kls Following the mailing of Varnum's letter to Maguire, Varnum received the preliminary 30-day notice or notice of findings of fact of Maguire, proposing a deficiency, under date of October 12, 1945. After reciting the transfers by the decedent to his children totaling, including the $28,000 cash, $64,130.03, as listed, the instrument, *266 in pertinent part, recites as follows: "The value of the property transferred by the decedent to his four children on December 31, 1941, is included in the gross estate, since the facts indicate that the transfers were made in contemplation of death within the meaning of Section 811(c) of the Internal Revenue Code. This conclusion is justified upon the grounds that the transfers were made in order to bar any dower or property rights in his prospective bride." On October 31, 1945, Anthony Parish executed the following affidavit: "State of Illinois "County of Kankakee] SS "IN THE MATTER OF THE ESTATE OF WILLIAM W. PARISH, Dec'd. "Affidavit of Anthony Parish "Anthony Parish, being first duly sworn upon his oath, deposes and says, that he is 52 years of age, a resident of Momence, Illinois, and he is at present President of the Parish Bank and Trust Company, and that he has been in the banking business in the capacity of cashier of the Parish Bank, Parish State Bank and Parish Bank and Trust Company for the past 24 years. "That the decedent, William W. Parish, died on October 15, 1944, and that this affiant was one of his children. "That the decedent *267 has been an active farmer all of his life and has been actively engaged in the banking business and associated with the aforesaid banks from the year 1914 up until the date of his death. "That the decedent deeded this affiant 70 acres of land back in the year 1921 and stated to him at that time that he intended later to give him the balance of this farm of which this 70 acres was a part. "Affiant states that in the year 1931 the Parish State Bank, of which the decedent was president, was compelled to close, and it was necessary for the decedent to raise a substantial amount of money in order to build up the capital structure of a new bank, andlater to pay off the depositors in the old Parish State Bank, whose accounts were not waived. The decedent at this time stated to this affiant that he would be unable to complete the gift of the balance of the farm out of which the 70 acres that was deeded to this affiant in 1921 was a part, but that after he, the decedent, would get the new bank started and the waived deposits all paid off, that he would complete this gift and deed him, this affiant, the balance of this farm. For an entire year this affiant, together with his two brothers, *268 Varnum A. Parish and William J. Parish, worked very diligently in trying to borrow the money to organize the Parish Bank and Trust Company. The Parish Bank and Trust Company was finally opened for business on November 19, 1932, and about that time the decedent stated that he intended to transfer some of the bank stock in the Parish Bank and Trust Company to this affiant in order to help reimburse this affiant for the year spent in helping to organize the new bank, and for the first two or three years of the time spent by this affiant working in the Parish Bank and Trust Company immediately following its organization. "The decedent stated many times to this affiant that he would be unable to make any further distribution of his property until all waived deposits had been repaid in full, as the decedent considered the money that the depositors had coming as a personal obligation, and the decedent was very conscientious in making it his duty to repay these waived deposits in full. "Along the latter part of the year 1939 and in the fore part of 1940, before the decedent deeded him the balance of the farm of which the first 70 acres deeded to him in 1921 was a part, the decedent on *269 numerous occasions in conversations had with this affiant, stated that since the waived deposits had now all been paid in full that he, the decedent, desired to deed the balance of the farm to this affiant, and also, it was his intention, according to his conversations, to deed to his other three children the balance of the farms of which he had deeded portions to his children in 1921. Consequently, in furtherance of this intention, the decedent did, in 1940, deed the balance of the aforesaid farms to his four children. "After the organization of the Parish Bank and Trust Company the decedent made the following transfers of stock in the new Parish Bank and Trust Company to this affiant and to his two brothers, William J. Parish and Varnum A. Parish, in the following amounts and on the following dates: "On November 3, 1932, 10 shares of stock in the Parish Bank and Trust Company were transferred to each of the three sons of decedent. "On December 26, 1933, 10 shares of stock in the Parish Bank and Trust Company were transferred to each of the three sons of decedent. "On January 1, 1935, 14 shares of stock in the Parish Bank and Trust Company were transferred to W. J. Parish. *270 "On January 14, 1939, 40 shares of stock in the Parish Bank and Trust Company were transferred to Anthony Parish, 40 shares to Varnum A. Parish and 26 shares to W. J. Parish. "This affiant states that he made his home with his mother, Catherine Parish and the decedent, who was his father, up until the forepart of February, 1940, at which time the mother of this affiant, Catherine Parish, died, and the decedent, the father of this affiant, came to live with this affiant in this affiant's home. The decedent continued to make his home with this affiant from the first part of February, 1940, until the 29th or 30th of December, 1941, at which time the decedent left the home of this affiant and married and established his own home. "This affiant states that in all of his 43 years of living with his mother and father, he never knew the decedent to be seriously sick. He did, occasionally, have common colds, but the decedent was never confined to his bed, and he only knows of one instance when he did go to a hospital for a week or so as the result of a common cold. This affiant states that the decedent was a very active man all his life; that he took unusual interest in all farming matters, *271 and continued this activity in managing his farms up until the spring of 1940, at the time that he deeded this affiant the balance of the farm referred to. "This affiant states that from the time the decedent made gifts to his children in 1940 and when he was at the age of 85 years he still continued to manage other property, belonging to him, which had not been the subject of gifts, and that it was his practice to go to the country perhaps on the average of three or four times a week, making drives from ten to twenty miles. "After my father came to live with me in February, 1940, I had occasion to be with him many hours. He was a man that never went out in the evening and we would sit and visit and on Sundays we would generally take long rides. During this time while my father lived with me he stated to me on numerous occasions that he intended to make a further distribution of his property, that he wanted to relieve himself of the burden of its management and wanted more time to enjoy himself. I believe the last times that he talked about his intention of making further distributions of his property were in the spring of 1941. When he would talk about making these gifts he stated *272 that he wanted to reserve a portion of his property, which would provide an income for himself, but that he wanted everything settled so he would be able to make the further gifts and distribution of his property that he intended to make to his children while he was in a position to do so, as he might some time want to get married, but he never definitely stated that he was going to get married. He never told me that he was positively going to get married or he never mentioned to whom he might get married. It was a shock to me when I first learned that he had got married on December 31, 1941. "This affiant states that all during the time that the decedent made his home with him, his appetite was good, he slept well at nights, and he enjoyed the best of health. He was mentally alert and clear on all topics and would discuss with me the topics of the day in a very alert manner for a man of his age. "This affiant further states that decedent did finally, in furtherance of the intentions expressed to me in the spring of 1941, make a division of his property in October of 1941, giving outright as gifts about one-third of his property to be divided equally among his four children, Varnum *273 A. Parish, William J. Parish, Carrie M. Parish and this affiant, and the other approximately two-thirds of his property he used to establish a trust in which he reserved a life interest. "This affiant further states that the decedent, after his marriage on December 31, 1941, spent that winter and the winter of 1943 and 1944 in Florida. The decedent purchased a house in Momence, Illinois, in the summer of 1942 and this affiant observed that the decedent took upon himself duties such as buying provisions for his household and paying gas, light and telephone bills, and he seemed to be very much interested in his new life. He would talk in the bank about his reservations for Florida, and that he intended to leave earlier than he had been leaving. "This affiant noticed nothing unusual in the physical appearance or activity of the decedent previous to September the 1st, 1944, at the time when the decedent fell when he was about to get in his car, and the many times that this affiant called on the decedent after his fall in September, 1944, when the decedent was confined to his home for the six weeks previous to his death, this affiant always observed that the decedent was in good spirits, *274 and that many times he had expressed hopes that he would recover and be able to be about again." On November 7, 1945, Varnum A. Parish, as administrator of decedent's estate, constituted an attorney in Chicago his attorney to appear before the Bureau of Internal Revenue in the matter of decedent's estate. After a discussion in the attorney's office, at which the three brothers were present, the attorney or his office prepared affidavits and a protest in the matter of the estate. Some reasons for the gifts were stated in the protest that were not given in the letter to Maguire. On February 26, 1946, Anthony Parish executed the following affidavit: "STATE OF ILLINOIS
"COUNTY OF KANKAKEE
SS "ANTHONY PARISH, being first duly sworn, upon his oath deposes and says as follows: "This affidavit is intended to be supplemental to the affidavit previously signed by me under date of October 31, 1945. "My grandfather, whose name was William W. Parish, Sr., who was the father of my father, William W. Parish, the decedent, made gifts to his children and grandchildren, during the course of his life, of a substantial part of his property. He did this from time to time, not all in one gift, *275 but he would make gifts to my father and various other members of his family, including his grandchildren, at different times. He only kept enough to get along on and he said to my knowledge, several times, that he thought it was a good plan for a man to give substantial amounts of property to his children and grandchildren, that all a man needed was enough to get along on and live on; that he wanted his children to have it and enjoy it. "My grandfather died in 1914. The first gift that my father made, of which I have any recollection or record, is the gift of December 11, 1920, when he gave me and my two brothers each ten shares of stock in the Parish State Bank. As stated in my previous affidavit, he made subsequent gifts in 1923, 1932, 1933, 1935, 1939, 1940 and 1941. "As I stated in my former affidavit, my father lived with me for about two years after my mother died, and before that, I lived with my mother and father. I was very close to my father and he used to talk to me a lot about his affairs and about the gifts which he was making. He often said, before making any gifts at all, that he thought that his father had had the right idea and that he was going to do the same *276 thing; that all he wanted was enough to get along on, that his wants were not great and he did not need large amounts of money. As a matter of fact, my father's wants were simple; he lived simply and did not spend much money. This was true of both my mother and father, in that they both lived frugally, except for some occasional travel. "At the time of making gifts and also at other times, my father told me that he wanted us children to have a part of his money so that we could enjoy it while we were still young enough to enjoy it. In giving us the farms, which were the gifts of 1923 and 1940, he was giving us incomeproducing properties, which he said relieved him of the care of the properties, benefiting him in that way, and which he said also benefited us in that it gave us the income from them to enjoy. "He often said what I have stated above, and particularly he made statements like that at the times when he gave us the various gifts. This includes the gifts of October 20, 1941. He discussed these gifts with me and with my brothers for at least four months before he made them, saying that he wanted to work out a plan whereby he could give to my sister, my brothers and myself *277 all of his money and securities which he did not need for his own maintenance. He did not ever tell me that he was going to be married. As I stated in my previous affidavit, it was a real surprise to me when he did marry. In talking about these gifts he said to me many times that what he was doing was following out the plan which he had always had and which his father had had, of giving to my brothers and my sister and myself everything of his property over and above what he needed for himself. I could not quote his exact words but what he would say would be something like this: "'Sometime soon I want to give you and your sister and brothers another gift. This one is going to be substantial, because when I make this one I want it to include everything that I have except enough for me to be comfortable on. I might want to get married some time. If I do get married it will be impossible for me to give you children any land without having my wife join in the deed. If I do get married I am going to complete these gifts before I do, so that I won't have to ask her permission and I won't have to ask her to join in deeds of the lands. I realize that getting married a second time sometimes *278 makes trouble in the family. I don't expect that if I get married it will please the other members of the family. This property which I am going to give you I consider it to be yours. I have always considered it to be ours together. In giving it to you I am just following out the plan which I have always had, that you should have this property, which you have helped me save when the bank closed and which you have helped me accumulate. I would do it anyway even if I were not going to be married, but you can be sure of it that if I do get married I'll do it beforehand so as to keep peace in the family.' "I would say that his motive in making the gift of 1941 was exactly the same as his motive for his gifts in all the other years. In his discussions of it with me, his statement of the reasons for wanting to do it was as I have stated above and there was no difference in his statement of his reasons in regard to the 1941 gifts and that in regard to the gifts of previous years. "Another thing that my father would say in connection with the 1941 gifts would be something like this: "'I have given you and your brothers and sister securities and property. I've seen that you know how to *279 handle these securities and property. I have seen that you have some property of your own, and you are all good sound people and know how to handle it. Up until 1940 I was giving you smaller gifts, except for the seventy acres of land to each of you, because I wanted you all to feel that you had to accumulate something for yourselves and not lean on me. Now I am satisfied to make a substantial division of property among you but I am going to hold onto enough to keep me for the rest of my life, and I am going to see your brothers [both my brothers are lawyers] and have them fix something up so that I will be taken care of the rest of my life. Mayo's tell me I am good for ten years more.' "My father also said words to the following effect: "'If I give you this property I am going to have more time to enjoy myself. I am going to relieve myself of the burden of taking care of it. You are going to have the burden of looking out for it and I want you to have the enjoyment of it.'" Varnum filed a verified protest with the revenue agent in charge in which he stated that one of the purposes of making the gifts may have been the desire of his father to bar his wife from receiving any *280 part of the property. At the conference in the Butz office Mr. Maguire talked about contemplation of death and about the marriage. Maguire dwelt upon the marriage and the fact that these gifts might have been made for cutting off dower. Varnum stated that his father told him that he was contemplating marriage and that he wanted to get his property in shape so that his second wife would not get any dower or other interest or any substantial share in that property after the marriage. It was mentioned that she would be entitled to her statutory rights in that property after death had that action not been taken. The word "dower" was used in connection with the gifts that were made to the four children as of December 1941. Varnum stated during the conversation that the purpose of the decedent in making the transfer in question or the gifts in question was to defeat all the right of the second wife which she might have in his property, and further that he did not want his second wife to have any interest in any property which he and his first wife had amassed. No person at that meeting objected to that statement. No other reason was advanced by any of the parties at the meeting as the motive *281 for making the gifts. Maguire's statement in the letter of August 6, 1945, "I was advised that a part or all of these gifts were made by the decedent in order to get this property out of his estate before his second marriage" referred to the statement made by Varnum Parish at the meeting. Maguire had no personal knowledge of the case except what he was told and the information contained upon the returns and papers filed. Maguire did not keep any notes on the conversations in Butz's office. Maguire did not know that the $28,000 cash was not given on the same day decedent transferred the other property to his children. He was not told when or how or in what amounts it was paid. Varnum stated in the meeting in Butz's office that his father told him that he was contemplating marriage and that he wanted to get his property in shape so that his second wife would not get any dower or statutory interest in that property or have any share in the property which he and his first wife had earned. In the conference Maguire covered the matter thoroughly because he had the Kroger case in mind. Maguire made a report on the case in which, in pertinent part, he stated: "All of the above transfers *282 were made when the decedent was over 85 years of age, made to the natural objects of his bounty and the total value of all such transfers constituted approximately 50 per cent of his wealth and, therefore, a material part of his estate. * * *
"* * * Investigation disclosed that the decedent was in excellent health for a man of his age when these transfers were made. It appears that he had started calling upon a lady friend in June, 1941, whom he subsequently married, the latter part of December, 1941. "It appears that the gifts in 1940 did not have any connection with his second marriage. It further appears that decedent made gifts of farms to his several children about 15 or 20 years prior to his death at which time he adviced [advised] the children that he later intended to give each of said children a deed to the farm out of which the original 70 acres were conveyed. It further appears that the gifts which were consummated in 1940 were a part of the decedent's original plan and would have been consummated prior to 1940 had it not been for the fact that the Parish Bank, of which the decedent was president and principal stockholder, was closed during the depression and *283 he wanted the farm lands, the subject of the 1940 gifts, so that he could use the income therefrom to pay off the depositors of the Parish Bank & Trust. It was not long after he had completed paying off the depositors in full that he conveyed these farms to his four children. "After giving consideration to the fact that the decedent was in excellent health for a man of his age in 1940 and the various causes which prompted the transfers in question, I am of the opinion that it is impossible to show that the transfers made in 1940 were made in contemplation of death within the purview of the Act. "However, the transfers made in 1941 were made for very different reasons. Representatives of the estate, which include two of the decedent's sons, advised me at a conference in the office of Vernon G. Butz, 409 Volkman Building, Kankakee, Illinois, that the 1941 transfers were made because he, the decedent, was contemplating marriage, and 'he told us that he wanted to get his property in shape before he married, that he did not want his second wife to get a substantial share of his property that had been earned by him and his first wife.' This statement was subsequently reduced to writing *284 and incorporated as part of a letter received by me from Varnum A. Parish, a son, and one of the co-executors dated August 7, 1945. This letter also sets forth other ostensible courses for making - it says 'courses' and not 'causes' - ostensible courses for making the gift to the effect that he, the decedent, did not want to be burdened with the responsibility of managing and looking after his property at his age. "I find that he did retain the management of the farm which he had given his daughter, [Carrie] M. Parish, up to the date of his death. * * *
"* * * It appears very clear that the 1941 gifts were made with a view to his contemplated marriage and for the purpose of defeating the dower and other property rights which the second wife would have had in the property, the subject of the 1941 gifts. I recommend that the gifts made in 1941 be included in the decedent's gross estate as having been made 'in contemplation of death' based upon the case of Kroger v. Commissioner, 145 of [Fed.] 2nd 901, Sixth Circuit, petition for review denied by United States Supreme Court, which held that a gift in trust to bar dower and other property rights of the donor's prospective *285 bride was necessarily 'in contemplation of death' and taxable as part of the donor's estate. "While other circuit courts are free to reach an opposite conclusion, it is a reasonable assumption that most, if not all, will hold to the same effect when confronted with this question." In the discussion in Butz's office the talk was that the decedent did not want her, his proposed wife, to spend and have at her disposal a substantial part of the property that his wife had helped him earn. The payment by the estate of estate taxes, inheritance taxes to the state of Illinois, and administration expenses exhausted the assets left in the estate at death, except those placed in trust. The deficiency notice, dated July 19, 1946, in pertinent part, after listing the properties transferred valued at $64,130.03 states: "It is determined that the transfer by the decedent on October 20, 1941, of equal undivided interests in various properties having an aggregate value of $64,130.03, to his four children, the natural objects of his bounty, and the simultaneous transfer in trust of substantially the entire remainder of his estate for the use and benefit of said four children, after reserving *286 certain benefits therein for himself during his lifetime, constituted a comprehensive and complete scheme for final distribution of his estate, putting his house in order against the time of his demise. Therefore, the transfer of such undivided interests in property was made in contemplation of death within the meaning of Section 811(c) of the Internal Revenue Code and the value thereof is properly includible in the decedent's gross estate." Opinion We must in this case, in deciding whether the decedent contemplated death within the intendment of section 811(c) of the Internal Revenue Code, resolve a sharp conflict of evidence, between the evidence of two of the petitioner's sons who were transferees in the matters in question, together with affidavits made by the transferees and a letter by one of them, and statements both written and in testimony from the internal revenue agent who investigated the matter of the estate. We have examined and set forth the facts in much detail above; and have compared and studied at length the testimony and the various and conflicting statements made by the witnesses. After doing so, we conclude that *287 the outright transfers of property and money made on October 20, 1941, and the $28,000 in cash given shortly thereafter were transfers made in contemplation of death within the Act. It is pointless to discuss at great length all of the considerations which have led us to this conclusion. We have had, in effect, to make a choice between the statements, at times contradictory of earlier statements, made by transferees interested to the extent of the transfers and the revenue agent who, though he can not be said to be altogether disinterested in the matter, can have no financial interest and none beyond seeing established the result at which he arrived in investigating the case. Since the revenue agent decided that the transfers of farms in 1940 was not in contemplation of death, he appears to have approached these matters with a not unfair attitude. If the decedent had primarily in mind, in making the transfers in question, his approaching marriage and the exclusion of his wife from dower or statutory interest in the property transferred, under Kroger v. Commissioner, 145 Fed. (2d) 901, such attitude comes within contemplation of death under section 811(c). Under all the *288 facts before us, not only the testimony of the internal revenue agent but statements by interested transferees themselves, we believe that the decedent's motive was connected with his impending marriage, and that his prime and dominant purpose was connected therewith and directed to prohibiting his future wife from sharing in the estate which he had built up with the assistance of his first wife. Not only did the internal revenue agent testify unequivocally that Varnum Parish, the petitioner here, stated in a conference in July 1945 that he wanted to get his property in shape so that his second wife would not get any dowel or other interest or any substantial share in that property after the marriage, but this is not inconsistent with the statement by Varnum Parish in his letter of August 7, 1945, responding to his request of the internal revenue agent as to how much of the property given in 1940 and 1941 was transferred in order to get the property out of his estate before his second marriage. Replying to that inquiry Varnum Parish, after stating that they did not think that the gifts in 1940 had any connection with the second marriage but were merely completion of something planned *289 years before, added that the gifts made in 1941 were really made for two reasons: Decedent "was contemplating marriage and he told us that he wanted to get his property in shape before he married; that he did not want his second wife to get a substantial share of his property that had been earned by him and his first wife." He then adds: "There was, however, a further reason for his gift in 1941" - desire to free himself from the burden of responsibility of looking after it. Thus it is clear that not only did Varnum Parish think that the main motive of the decedent was desire to keep the property from his second wife, but that his statement amounts to almost the same as that of the internal revenue agent who testified that Varnum had specifically given prevention of dower as a reason for the transfer. We can not reasonably ascribe the above statement taken from Varnum's letter to a mere fear on decedent's part that his future wife would, while they were living together, get a "substantial share of the property"; but we think that he had reference to what she would take upon his death. For decedent lived frugally. His scale of living during the last five years was comparatively modest; *290 he spent about $600 for furnishings on a new home costing about $5,000, and his household expenditures were not large. His wife did not have much property. We can not believe that the decedent was so fearful that his wife would cause him to dissipate his estate during his lifetime that he needed to transfer it to his children. In his verified protest Varnum stated that one of his father's purposes for making the gifts may have been his desire to bar his wife from receiving any part of the property. This is inconsistent with the present positive contention that prevention of dower or statutory share of property was never his father's motive. Statements made prior to the rising of a controversy, most particularly by an interested party, must logically be given more weight than interested and biased statements during the course of litigation. Very shortly after the conference at which the revenue agent testifies that the statements as to dower and statutory share of property were made, he gave Varnum an opportunity to set forth his father's reasons for making the gifts. In reply Varnum did not suggest that there was no motive to bar dower or statutory share, though he was an attorney *291 and must be presumed to be familiar with that concept, and though the fact that the Kroger case was, the internal revenue agent testified, in his mind during the discussion and he covered the matter thoroughly and therefore must reasonably be considered to have gone into the question of barring dower or statutory share in property, at the conference. The revenue agent's testimony was positive that at the conference he talked about contemplation of death, about marriage, about the fact that the gifts might have been made for cutting off dower; and equally positive that Varnum had stated that his father had said that he wanted to get his property in shape so that his wife would not get dower or any substantial share in the property after marriage. With reference to the petitioner's contention that the gifts made in 1941 were in connection with the father's plan of some 20 years before to make gifts, interrupted by the closing of the bank and the repayment of depositors, the facts indicate to us that too much weight is given thereto. In his letter of August 7, 1945, to Maguire, Varnum makes that suggestion only with reference to the gift of farms in 1940. He does, of course, later contend *292 that the father's early plan to make gifts was explanatory of those made in 1941. In our opinion, the father's early intention to make gifts can not reasonably be considered basis for anything beyond the gift of farms in 1940, which in a way completed a gift he had started about 1923 when he donated 70 acres to each. The idea that the completion of repayment of depositors kept the plan to make gifts from being carried out until October 1941 is not impressive, for obviously the father could have made these gifts long before October 1941. His net worth when the bank closed was about $150,000, taking the depression into consideration, and the 40 per cent still to be paid was $45,000 to $50,000. By early 1939 the repayment to depositors was very largely disposed of, a 10 to 15 per cent payment being made about that time and the final payment being about the same amount. It seems obvious that a man of the decedent's means was not reasonably delayed in making gifts after early 1939 by the possibility of having to assist in paying 10 or 15 per cent of $45,000 or $50,000. The idea of repaying the sons for their assistance in the liquidation of the bank and repayment of depositors as reason *293 for the gifts in 1941 seems to us to be stressed too much. The sons did not all contribute service alike and apparently the daughter contributed no services, in that respect, yet they were treated alike financially in the gifts in 1941. Moreover, the gifts of bank stock and of the farms in 1940 seem to leave no logical reason for extending the thought to the later gifts in 1941. The outright gifts on October 20, 1941, were executed at the same time with the trust in which the idea of death was obvious, since income was reserved for decedent's lifetime. Though there is contention that the two matters were separate, we are not impressed. A contention that the trust was not originally planned with the gifts does not separate them as finally consummated. The contemplation of death appears also in the decedent's statements that he did not wish to wait to give the property to them, the children, when he died, and that he wanted to keep enough property to live on, enough for his livelihood as long as he lived. These thoughts in one of his age can not be overlooked in connection with the other facts. That the $7,000 cash was approximately equivalent to rents on property earlier given is *294 only a computation by the witness, specifically not based upon any statement by the decedent. From the whole history of the investigation and presentation of this case it is apparent that reasons now advanced against contemplation of death were not earlier in the minds of the parties. The trust and gifts exhausted the greater part of the estate. Weighing as best we may all of the testimony before us, with its contradictions, we conclude and hold that the decedent transferred the property and money here involved, that is, the property conveyed outright on October 22, 1941, and the $28,000 in cash thereafter, in contemplation of death within the intendment of section 811(c) of the Internal Revenue Code. In arriving at our conclusion above we have not considered that the decedent was unsound physically or mentally at the time of the gifts involved. We have set forth all of the facts in that respect but they do not justify any conclusion either that the decedent's outlook on life in general or his physical condition caused fear of imminent death. The respondent has made no request for findings in this respect and the revenue agent in his report found that the decedent *295 was in excellent health for a man of his age in 1940 and did not base his conclusion as to the gifts in 1941 upon reasons of health. Decision will be entered under Rule 50.